1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   ROBIN GONZALES,

10              Plaintiff,                         No. C 08-01754 JSW

11       v.

12   CITY OF MARTINEZ, et al.,                     **ORDER GRANTING IN PART
                                                   AND DENYING IN PART
13              Defendants.                        DEFENDANTS' MOTION FOR
                                                   SUMMARY JUDGMENT**
     _____/
14

15       Now before the Court is the motion for summary judgment filed by defendants the City

16  of Martinez (the "City"), David Cutaia, who was Chief of Police until December 31, 2007

17  ("Cutaia"), Tom Simonetti, who was a Commander for Martinez up until December 31, 2007,

18  after which he became Chief of Police ("Simonetti"), Commander Mark Smith ("Smith"),

19  Detective Sergeant Gary Peterson ("Peterson"), and City Manager Don Blubaugh ("Blubaugh")

20  (collectively, "Defendants").  Having carefully reviewed the parties' papers and considered

21  their arguments and the relevant legal authority, and good cause appearing, the Court grants in

22  part and denies in part Defendants' motion for summary judgment.[1]

23                              **BACKGROUND**

24       Plaintiff Robin Gonzales ("Plaintiff") alleges that she was discriminated based on her

25  disability by Defendants.  Plaintiff began working for the City's Police Department in 1985 as a

26  dispatcher.  (Declaration of Robin Gonzales ("Gonzales Decl."), ¶ 2.)  In 1986, Plaintiff

27

28       [1] The Court GRANTS Defendants' request for judicial notice.  *See* Fed. R. Evid. 201.
    The Court addresses some of Defendants' evidentiary objections throughout this Order.
    However, the Court need not rule on the remainder of Defendants' evidentiary objections
    because the Court did not need to consider such evidence in order to resolve the motion for
    summary judgment.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  transferred into a police assistant position.  In that position, her primary duties were to maintain

2  the evidence room for the Police Department.  (*Id*., ¶ 3.)  In 1991, pursuant to Plaintiff's

3  request, her position was reclassified from police assistant to evidence property technician

4  ("EPT").  (*Id*., ¶ 4.)  In that position, Plaintiff was responsible for collecting evidence at crime

5  scenes, ensuring that all property and evidence was booked and maintained in accordance with

6  the law and Department procedures, and purging evidence that was no longer needed.

7  (Declaration of Tom Simonetti ("Simonetti Decl."), ¶ 2.)  Her job description as an EPT, similar

8  to that of police assistants, included working in the Dispatch Center on a fill-in or relief basis.

9  (*Id*., ¶ 2, Ex. 1; Declaration of David Cutaia ("Cutaia Decl."), ¶ 2.)  Plaintiff was in the EPT

10  position until the City eliminated it on November 28, 2007.  (Gonzales Decl., ¶ 4.)  During this

11  time, Plaintiff worked intermittently as a dispatcher.  (*Id*.)  Plaintiff volunteered to work

12  overtime on the Friday shifts in the Dispatch Center because then she could recuperate over the

13  weekend from the pain it caused her.  (*Id*.)

14       In early June 2000, Plaintiff suffered an industrial injury, consisting of several herniated

15  disks in her neck.  As a result, a doctor imposed restrictions on the time she could work as a

16  dispatcher.  (*Id*., ¶ 6.)  Plaintiff's note from her doctor dated March 28, 2002 provided that

17  Plaintiff could work no more than three days per week or work no more than two consecutive

18  days in the Dispatch Center.[2]  (Simonetti Decl., Ex. 4.)  Plaintiff's injury was caused in part by

19  the non-ergonomic configuration of the Dispatch Center.  The City corrected the non-ergonomic

20  configuration after Plaintiff suffered her injury.  (Gonzales Decl., ¶ 6.)  Plaintiff contends that

21  working as a dispatcher is an activity that is stressful on her cervical spine.  (*Id*.)

22

23

24       [2] Plaintiff argues that her work restrictions from her doctor limited her to working
just one dispatch shift per week, but does not support her argument with any evidence.  *See*
25  *S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690
F.2d 1235, 1238 (9th Cir. 1982) (stating that "a party cannot manufacture a genuine issue of
26  material fact merely by making assertions in its legal memoranda").  To defeat the motion for
summary judgment, Plaintiff was obliged to set forth specific facts supported by admissible
27  evidence, *i.e.*, affidavits or certified deposition testimony, showing that there is a genuine
issue for trial.  *See id.*; *see also Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (stating
28  that it is not a district court's task to "scour the record in search of a genuine issue of triable
fact").

2

United States District Court

For the Northern District of California

1    Beginning in 2002, calls for service into the Dispatch Center increased.  (Simonetti

2    Decl., ¶ 3.)  From 2003 to 2007, there were not enough regular full-time employees in the

3    Dispatch Center.  As a result, Dispatch shifts had to be filled by other employees who worked

4    on an overtime basis to fill the shifts.  (*Id.*)  Plaintiff had volunteered to work in the Dispatch

5    Center during this time period.  (*Id.*)  Simonetti discovered that it was likely that the amount

6    spent on overtime was going to significantly exceed the allotted budget and thus began looking

7    into other ways to staff the Dispatch Center.  (*Id.*, ¶ 4.)

8    Starting in October of 2004, Simonetti assigned Plaintiff to work one shift per week in

9    Dispatch.[3]  (*Id.*, ¶ 5; Supplemental Declaration of Suzanne Solomon ("Suppl. Solomon Decl."),

10   Ex. 1 (Deposition of Robin Gonzales) at 68:16-69:3.)  Shortly after she was informed that she

11   would be working one day in the Dispatch Center, Plaintiff asked Simonetti if she could move

12   up in the bidding order so that she could volunteer to work even more Dispatch shifts on an

13   overtime basis.  Simonetti granted her request.  (Simonetti Decl., ¶ 6.)

14   Peterson became Plaintiff's direct supervisor in 2005.  (Gonzalez Decl., ¶ 9.)  Over time,

15   Peterson increased the number of shifts Plaintiff was required in dispatch to two to three shifts

16   per week.[4]  Plaintiff contends that Peterson increased her shifts in dispatch despite knowing that

17   dispatch work aggravated Plaintiff's injury to her neck and was in violation of her work

18   restrictions.  (*Id.*)  Plaintiff further contends that assigning her to work these additional shifts in

19   dispatch was done a part of a campaign to harass, retaliate and discriminate against Plaintiff

20   regarding her injury and disability.  (*Id.*)

21

22

23

24   [3] Although Plaintiff also states in her declaration that she had only worked
     sporadically in dispatch until Peterson ordered her to begin working one day per week in
25   dispatch, this statement contradicts her deposition testimony.  The Court finds that this
     portion of her declaration is a sham affidavit and is thus stricken under *Kennedy v. Allied*
26   *Mutual Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991).

27   [4] Defendants submit evidence showing that it was Simonetti who made the decision
     to increase Plaintiff's assigned shifts in the Dispatch Center from one to two days per week,
28   as well as assign Dispatch shifts to a police assistant, Mike Morley.  Simonetti declares that
     he made this decision because by early 2005, the Police Department had exhausted its
     overtime budget for the 2004-2005 fiscal year.  (Simonetti Decl., ¶ 7.)

3

United States District Court

For the Northern District of California

1    In 2005, Plaintiff submitted a written complaint to Cutaia and Simonetti.[5]  (*Id.*, ¶ 10.)

2    Plaintiff contends that in response to her written complaint, Cutaia, Simonetti, Smith and

3    Peterson eliminated the EPT position in retaliation for her work restrictions due to her disability

4    and for her complaining about Peterson's harassment against her based on her disability.  (*Id.*)

5    Simonetti states that because the Police Department was having difficulty keeping the

6    Dispatch Center fully staffed, he directed Dispatch Supervisor Renee Jacobs to find out how

7    many Dispatcher positions other, similar-sized agencies had.  (Simonetti Decl., ¶ 9.)  Simonetti

8    discussed the possibility of creating a new dispatcher position, but then Chief Cutaia said that

9    the Police Department did not have the funds to create a new position.  Therefore, Simonetti

10   conducted an analysis to determine whether the Department could streamline some job

11   functions by eliminating a position and reallocating that position to the Dispatch Center.  (*Id.*)

12   Simonetti determined that either a police assistant position or the EPT position could be

13   eliminated.  (*Id.*)  Simonetti estimated that the functions of the EPT position could be performed

14   in less than 40 hours per week and noted that, by 2006, some of the EPT functions were being

15   performed by a police assistant, Mike Morley.  (*Id.*, ¶ 11.)  On April 5, 2006, Simonetti

16   prepared a memo to the then Chief Cutaia recommending that the Police Department eliminate

17   the EPT position and reallocate those funds to create an additional dispatcher position.  (*Id.*, ¶

18   12, Ex. 3.)  Then Chief Cutaia approved the recommendation and wrote a memo dated July 16,

19   2006 to the Martinez Civil Service Commission recommending that the EPT classification be

20   reallocated to create an additional dispatcher position.  (Cutaia Decl., ¶¶ 5, 6, Ex. 2.)

21   Plaintiff states that she contacted Paul Holes as the county crime lab, who informed her

22   that the lab would only respond to the police department's crime scenes in an advisory manner.

23   Plaintiff contends that she reported this information in writing to the City Manager, but that the

24   _____

25   [5] Again, although Plaintiff states in her declaration that this complaint was submitted because of the harassment against her based on her disability, Plaintiff testified in her deposition that this complaint did not allege that any events had happened because of a
26   disability.  (Declaration of Suzanne Solomon ("Solomon Decl."), Ex. 1 (Gonzales Depo.) at 148:14-150:1.)  Plaintiff further testified that she did not know whether she had ever written
27   any memo asserting that Peterson was treating her a certain way because of her alleged disability.  (Suppl. Solomon Decl., Ex. 1 at 127:23-128:3.)  Therefore, the Court finds that
28   this portion of her declaration is a sham affidavit and is thus stricken.  Kennedy, 952 F.2d at 266-67.

City ignored the lab's position. (Gonzales Decl., ¶ 12.)  However, Smith declares that when he became aware of Plaintiff's contention that the Contra Costa County Sheriff's Office crime lab would not be able to respond to the Police Department's crime scenes in the future, Smith contacted Paul Holes, the director of the county crime lab. (Smith Decl., ¶ 9.)  Mr. Holes told Smith that the county crime lab would continue to respond to the Police Department's crime scenes as they had in the past. (*Id.*)  Smith informed Simonetti of what Mr. Holes told him. (*Id.*; Simonetti Decl., ¶ 22.)  Moreover, Plaintiff testified Mr. Holes did not tell her that the county crime lab would at some point be refusing to come out to the Police Department's crime scenes. (Solomon Decl., Ex. 1 (Gonzales Depo.) at 285:20-25.)

In July 2006, Plaintiff initiated a grievance when she first learned that the EPT position would be eliminated. (*Id.*, ¶ 16; *see also* Cutaia Decl., ¶ 10, Ex. 3.)  The City Manager, Blubaugh hired one investigator to conduct an investigation.[6] (Gonzales Decl., ¶ 16.)  The City retracted the proposal for eliminating the EPT position pending the investigation of Plaintiff's complaint. (Cutaia Decl., ¶ 11.)  The City denied Plaintiff's grievance. (Gonzales Decl., ¶ 16.)  In April 2007, then Chief Cutaia wrote to the Civil Service Commission again to recommend that the EPT position be reallocated. (Cutaia Decl., ¶ 12, Ex. 4.)  Cutaia presented this proposal to the Civil Service Commission in May 2007.  Both Plaintiff and her counsel appeared and argued that the proposal was discriminatory. (*Id.*, ¶ 13.)  The Civil Service Commission voted to recommend the reallocation to the Martinez City Council. (*Id.*)

In October 2007, the Martinez City Council voted to approve the Civil Service Commissioner's recommendation and thus reallocated the EPT position to create an additional dispatcher position. (Cutaia Decl., ¶ 14.)  In November 2007, the City eliminated the EPT position.  The City's stated reason for eliminating the EPT position was to accommodate a new dispatch position that was needed.  Plaintiff contends that instead of eliminating the EPT

---

[6] Plaintiff contends that the City was required pursuant to a memorandum of understanding ("MOU") to hire two investigators, one chosen by the City and one chosen by Plaintiff.  However, Plaintiff did not submit a copy of the MOU.  Defendants object to Plaintiff's description of the MOU on the grounds that pursuant to Federal Rule of Evidence 1002, Plaintiff was required to submit a copy of the MOU.  The Court sustains Defendant's objection.

United States District Court

For the Northern District of California

1    position to accommodate the new dispatch position, the City should have eliminated the open

2    police assistant position.  (Gonzales Decl., ¶ 15.)

3          Upon elimination of the EPT position, then Chief Cutaia sent her a letter informing her

4    of the City Council's decision.  Plaintiff was given the option of being laid off or, in lieu of

5    being laid off, Plaintiff could have transferred to a position she previously held – a dispatcher or

6    police assistant. (Cutaia Decl., ¶ 15. Ex. 5.)  Plaintiff was informed that she would be able to

7    retain her current salary if she chose either position.  (*Id.*)  The letter further informed Plaintiff

8    that upon her written request, she could receive notifications of available positions for which

9    she was qualified.  (*Id.*, Ex. 5.)  Plaintiff chose to take the police assistant position.

10         The Court shall address additional facts as necessary in the remainder of this Order.

11                                    **ANALYSIS**

12   **A.    Summary Judgment Standard.**

13         Summary judgment is proper when the "pleadings, depositions, answers to

14   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

15   genuine issue as to any material fact and that the moving party is entitled to judgment as a

16   matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is sufficient evidence

17   for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

18   477 U.S. 242, 248-49 (1986).  A fact is "material" if the fact may affect the outcome of the case.

19   *Id.* at 248.  "In considering a motion for summary judgment, the court may not weigh the

20   evidence or make credibility determinations, and is required to draw all inferences in a light

21   most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.

22   1997).  A principal purpose of the summary judgment procedure is to identify and dispose of

23   factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).  The

24   party moving for summary judgment bears the initial burden of identifying those portions of the

25   pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of

26   material fact. *Id.* at 323.  Where the moving party will have the burden of proof on an issue at

27   trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for

28   the moving party. *Id.*  Once the moving party meets this initial burden, the non-moving party

**United States District Court**
For the Northern District of California

6

**United States District Court**
For the Northern District of California

1   must go beyond the pleadings and by its own evidence "set forth specific facts showing that

2   there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The non-moving party must "identify

3   with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*,

4   91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251

5   (7th Cir. 1995)) (stating that it is not a district court's task to "scour the record in search of a

6   genuine issue of triable fact").  If the non-moving party fails to make this showing, the moving

7   party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

8   **B.      Defendant's Motion.**

9              **1.      Plaintiff's Claims of Disability Discrimination.**

10             Plaintiff contends that Defendants discriminated against her by (1) assigning her to work

11  in the Dispatch Center while not assigning other police assistants to work in the Dispatch

12  Center; (2) eliminating her EPT position, as opposed to a police assistant position, in order to

13  reallocate funds to create a new dispatcher position; (3) forcing her to perform an unreasonably

14  high amount of work in her position as police assistant; (4) writing her up for abuse of sick

15  leave; and (5) Smith's refusal to speak with the Citrus Height's background investigator.

16  Defendant argues that none of these alleged adverse actions occurred because of Plaintiff's

17  disability; the City had legitimate, non-discriminatory reasons for the alleged actions.

18             In order to prevail on her disability claims, Plaintiff first must establish a *prima facie*

19  case of discrimination.  *See, e.g., Raytheon Co. v. Hernandez,* 540 U.S. 44 (2003); *McDonnell*

20  *Douglas Corp. v. Green*, 411 U.S. 792 (1973).   To establish a *prima facie* case of disability

21  discrimination, Plaintiff must show that: (1) she is disabled; (2) she is "otherwise qualified" for

22  the position, with or without a reasonable accommodation; and (3) she suffered an adverse

23  employment action because of her disability.  *Zukle v. Regents of Univ. of Calif.*, 166 F.3d 1041,

24  1045 (9th Cir. 1999); *Jenson v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 254 (2000).

25  Moreover, to establish a *prima facie* case of disparate treatment, Plaintiff "must offer evidence

26  that gives rise to an inference of unlawful discrimination. ... Failure to allege 'specific facts'

27  that establish the existence of a prima facie case renders a grant of summary judgment

28  appropriate." *Juardo v. Eleven-Fifty Corp.* 813, f.2d 1406, 1409 (9th Cir. 1987).  If Plaintiff

1    establishes her *prima facie* case, the burden shifts to Defendants to offer a legitimate non-

2    discriminatory reason for the adverse actions.  If Defendants proffer such a reason, the burden

3    shifts back to Plaintiff to show that Defendants' reason is actually a pretext for discrimination.

4    *Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir. 1990) (citing *Reynolds v. Brock*, 815 F.2d 571,

5    574 (9th Cir. 1987)).

6                    **a.       Decision to Assign Plaintiff Dispatch Shifts.**

7           Plaintiff argues that Peterson's decision to assign Plaintiff to dispatch shifts was

8    discrimination based on her disability.[7]  Defendants present evidence demonstrating that it was

9    Simonetti, as opposed to Peterson who made the decision to assign Plaintiff to work one shift in

10   the Dispatch Center in 2004 and then an additional shift in 2005.  (Simonetti Decl, ¶¶ 3-6; *see*

11   *also* Suppl. Solomon Decl., Ex. 1 (Gonzales Depo.) at 68:16-69:3.)  Simonetti made this

12   decision based on the need to fill open shifts in the Dispatch Center, Plaintiff's job description

13   which stated that she could work in the Dispatch Center on a fill-in or relief basis, her POST-

14   certification as a dispatcher, and her prior experience as a dispatcher.  (*Id.*)  Plaintiff testified

15   that she understood that the Police Department had a legitimate need to fill dispatch shifts when

16   she was assigned to work two dispatch shifts per week.  (Solomon Decl., Ex.1 (Gonzales Depo.)

17   at 87:10-19.)  Shortly after she was informed that she would be working one day in the Dispatch

18   Center, Plaintiff asked Simonetti if she could move up in the bidding order so that she could

19   volunteer to work even more Dispatch shifts on an overtime basis.  Simonetti granted her

20   request.  (Simonetti Decl., ¶ 6.)

21          Over time, the number of shifts Plaintiff was required to work in dispatch increased to

22   two to three shifts per week.  Plaintiff states in her declaration that Peterson, as her supervisor,

23   was the one to assign Plaintiff additional shifts, while Defendants submit evidence

24   demonstrating that it was Simonetti who made the decision.  However, the Court finds that the

25   dispute over who assigned her to work additional dispatch shifts is not material.  Plaintiff

26

27          [7] Although Plaintiff also states in her declaration that she had only worked
     sporadically in dispatch until Peterson ordered her to begin working one day per week in
28   dispatch, this statement contradicts her deposition testimony.  The Court struck this portion
     of her declaration as a sham affidavit.  *See Kennedy*, 952 F.2d at 266-67.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    contends that Peterson increased her shifts in dispatch despite knowing that dispatch work

2    aggravated Plaintiff's injury to her neck and was in violation of her work restrictions.

3    (Gonzales Decl., ¶ 9.)  Plaintiff further contends that assigning her to work these additional

4    shifts in dispatch was done a part of a campaign to harass, retaliate and discriminate against

5    Plaintiff regarding her injury and disability.  (*Id.*)

6           Although Plaintiff argues that she was ordered to work shifts in dispatch in violation of

7    her work restrictions, the only doctor's note in the record provides that Plaintiff can work no

8    more than three days per week and no more than two days consecutively.  (Simonetti Decl., Ex.

9    4.)  Plaintiff's doctor clarified in her deposition that by shift she meant between 8 to 10 hours.

10   (Sidran Decl., Ex. G (McQuinn Depo.) at 58:10-25.)  Plaintiff has not submitted any evidence

11   demonstrating that these restrictions were violated.  Moreover, in support of her contention that

12   she was scheduled to work additional shifts in dispatch despite knowing that working in

13   dispatch caused her pain, Plaintiff cites to the deposition of David J. Cutaia in which he states:

> Q:  Okay.  Do you recall that – when Ms. Gonzales was assigned two of her
>      four shifts to dispatch that she began complaining that that caused her
>      physical pain because of an industrial injury she had?
> A:   I was aware as I believe that Commander Simonetti made me aware of
>      that.
> Q:  And what do you recall being done in that regard?
> A:   I believe that Commander Simonetti met with her immediately and said if
>      you cannot do the two days, we will change that, you know, give me a
>      memo or a note saying that you can't and we will immediately change
>      that.  In fact, we'll pull you completely out of dispatch if that causes or
>      exacerbates a malady that you may have.

20   (Sidran Decl., Ex. C (Cutaia Depo.) at 83:5-17.)  At oral argument, Plaintiff conceded that she

21   was asked for a note or memo to support her contention that she had work restrictions beyond

22   what was stated in Dr. McQuinn's note dated March 28, 2002.  Plaintiff has not submitted any

23   evidence to show that she provided any such note or memo to Defendants demonstrating that

24   her work restrictions were more limited.  Therefore, the Court finds that Plaintiff has not

25   demonstrated the existence of a material question of fact regarding whether she was

26   discriminated against based on her disability by the assignment to dispatch shifts.  Plaintiff thus

27   fails to establish a *prima facie* case of disability discrimination and fails to show that

28

United States District Court

For the Northern District of California

1    Defendants' legitimate nondiscriminatory reason for giving her dispatch shifts within her

2    medical restrictions was pretext for discrimination.

3         On a related note, Plaintiff also contends that Defendants' decision to assign her more

4    dispatch shifts was discriminatory in that they should have trained other police assistants to

5    work in dispatch, rather than her.  However, the Court has already found that Plaintiff failed to

6    show a material question of fact as to whether she was assigned to work in dispatch in

7    discrimination based on her disability.  In addition, Defendants submitted evidence to show that

8    they had legitimate nondiscriminatory reasons with respect to which police assistants were

9    assigned to shifts in the Dispatch Center.  Although Michael Morely, a police assistant, did not

10   have the POST Dispatch certification, and thus was not authorized to answer emergency calls,

11   Simonetti assigned him to work shifts in dispatch to answer the non-emergency phone calls.

12   (Simonetti Decl., ¶ 7.)  Mr. Morely had received dispatch training from the Police Department.

13   (*Id.*)  Simonetti further ordered the dispatch supervisor, Renee Jacobs, to fill in some shifts in

14   the Dispatch Center and to provide in-house Dispatch training to the other two police assistants,

15   Terry Johnston and Dennis Chermak.  (*Id.*, ¶¶ 7-8.)  Mr. Johnston did not pass the in-house

16   training and Mr. Chermak, after working a few shifts in dispatch, expressed extreme anxiety

17   over the possibility that he could make a mistake that could have serious consequences for

18   citizens or officers in the field.  Therefore, Mr. Johnston was not allowed to fill in vacant

19   dispatch shifts and Mr. Chermake was not scheduled to work any more shifts based on his

20   extreme anxiety.  (*Id.*, ¶ 8.)  To the extent Plaintiff argues that there were employees who

21   requested, but were denied, to be provided POST-certfied training, she has not submitted any

22   evidence in support of this contention.  Therefore, the Court finds that Plaintiff fails to establish

23   a *prima facie* case of disability discrimination or that Defendants' proffered legitimate non-

24   discriminatory reason was pretextual.

25                    **b.      Reallocation of EPT Position.**

26        Plaintiff argues that Defendants eliminated her EPT position and reallocated the position

27   to the Dispatch Center in discrimination against her based on her disability.  When the EPT

28   position was eliminated, Defendants offered Plaintiff a choice of becoming a dispatcher or a

police assistant.  Plaintiff chose the police assistant position.  Defendants provided Plaintiff with the same salary as police assistant that she was making as the EPT.  (Cutaia Decl., ¶ 15, Ex. 5.)  Moreover, in addition to retaining the same salary, Plaintiff retained the same responsibilities with respect to evidence.

First, it is not clear that Plaintiff has demonstrated that her being transferred to the police assistant position while retaining the same salary and substantially similar responsibilities with respect to evidence was a demotion or otherwise constituted an adverse employment action.  Although she argued at oral argument that she lost prestige with the change in title, Plaintiff failed to point to evidence in the record in support of this contention.

Second, even if Plaintiff could demonstrate a *prima facie* case of discrimination, Plaintiff has not demonstrated that there is a question of material fact regarding Defendants' proffered legitimate nondiscriminatory reason.  It is undisputed that the Police Department had a legitimate need to create an additional dispatcher position.  Simmonetti conducted an analysis to determine whether the Police Department could streamline some job functions.  That analysis included an informal survey of similar agencies to see how they staffed and managed their evidence functions and an examination of the functions and hours requirements of both the police assistant and EPT positions.  (Simonetti Decl., ¶ 9.)  The survey also included a determination of how many dispatch positions other similarly-sized agencies had.  (*Id.*)

Simonetti estimated that the functions of the EPT position could be performed in less than 40 hours per week.  (*Id.*, ¶ 11.)  Plaintiff herself admitted that handling the evidence room required 20 to 30 hours per week.  (Compl., ¶ 35.)  Moreover, Simonetti noted that, by 2006, some of the EPT functions were being performed by police assistant Mr. Morley.  (Simonetti Decl., ¶ 11.)

On April 5, 2006, Simonetti prepared a memo to then Chief Cutaia recommending that the Police Department eliminate the EPT position and reallocate those funds to create an additional dispatcher position.  (*Id.*, ¶ 12, Ex. 3.)  In the memo, Simonetti explained that the projected annual overtime for the Dispatch Center exceeded the budget.  Simonetti further explained his belief that eliminating a police assistant position would result in fewer parking

1   citations being written and delays in removing abandoned automobiles.  He recommended

2   eliminating the EPT position based on his estimate that the position did not require 40 hours per

3   week and that the functions of the EPT position could be performed by a police assistant or split

4   between two police assistants who could work the duties into their existing duties.  (*Id*., ¶ 12,

5   Ex. 3.)

6   Then Chief Cutaia approved the recommendation and wrote a memo dated July 16, 2006

7   to the Martinez Civil Service Commission recommending that the EPT classification be

8   reallocated to create an additional dispatcher position.  (Cutaia Decl., ¶¶ 5, 6, Ex. 2.)  The Civil

9   Service Commission heard the matter on May 8, 2007.  Both Plaintiff and her attorney appeared

10  and argued that the proposal to eliminate the EPT position and reallocate it to the Dispatch

11  Center was discriminatory.  (*Id*., ¶ 13.)  The Civil Service Commission voted to recommend the

12  action to the Martinez City Council, which, in turn, approved the recommendation in October

13  2007.  (*Id*., ¶¶ 13, 14.)

14  Plaintiff has not shown that Defendants' proffered legitimate non-discriminatory reason

15  for eliminating the EPT position and reallocating it to the Dispatch Center was a pretext for

16  discriminating against Plaintiff based on her disability.  A plaintiff may "show pretext directly,

17  by showing that discrimination more likely motivated the employer, or indirectly, by showing

18  that the employee's explanation is unworthy of credence."  *Vasquez v. County of Los Angeles*,

19  349 F.3d 634, 641 (9th Cir. 2003).  "To show pretext using circumstantial evidence, a plaintiff

20  must put forward specific and substantial evidence challenging the credibility of the employer's

21  motives."  *Id*.

22  Plaintiff contends that she informed the City that Mr. Holes from the county crime lab

23  told her that the county crime lab would only respond to crime scenes in an advisory capacity

24  and that Plaintiff reported this information in writing to City Manager Blubaugh.  (Gonzales

25  Decl., ¶ 12.)  Plaintiff further contends that the City ignored the lab's position.  (*Id*.)  However,

26  Smith declares that when he became aware of Plaintiff's contention that the Contra Costa

27  County Sheriff's Office crime lab would not be able to respond to the Police Department's

28  crime scenes in the future, Smith contacted Mr. Holes, the director of the county crime lab.

United States District Court

For the Northern District of California

1   (Smith Decl., ¶ 9.)  Mr. Holes told Smith that the county crime lab would continue to respond to

2   the Police Department's crime scenes as they had in the past.  (*Id*.)  Smith informed Simonetti

3   of what Mr. Holes told him.  (*Id*.; Simonetti Decl., ¶ 22.)  Moreover, Plaintiff testified Mr.

4   Holes did not tell her that the county crime lab would at some point be refusing to come out to

5   the Police Department's crime scenes.  (Solomon Decl., Ex. 1 (Gonzales Depo.) at 285:20-25.)

6   Therefore, Plaintiff's declaration fails to demonstrate a question of fact regarding the

7   Defendants' proffered legitimate, non-discriminatory reason.  The Court finds that Plaintiff has

8   proffered no direct or circumstantial evidence to demonstrate pretext.[8]

9                          **c.      Forcing Plaintiff to Perform Unreasonably High Amount of Work.**

10          As a police assistant, Plaintiff continues to perform the evidence duties she performed

11   under the EPT position and also performs training management duties.  The training

12   management duties were assigned to Plaintiff as an accommodation in lieu of other police

13   assistant tasks that she could not perform due to her disability – directing traffic and writing

14   parking tickets.  Plaintiff told Smith that she was concerned that she could not direct traffic or

15   write parking tickets because she had a limited ability to walk for extended period, to stand for

16   extended periods, or to perform repetitive arm motions for extended periods.  (Declaration of

17   Mark Smith ("Smith Decl."), ¶¶ 5, 6.)

18          The training management duties were to facilitate police personnel's attendance at both

19   in-house and outside training courses, including identifying training, scheduling employees'

20   attendance at the training (including managing the effect that attendance has on work

21   schedules), and making the travel arrangements.  (Smith Decl., ¶ 6.)  The training management

22   duties have historically been performed in conjunction with employees' other duties.  Renee

23   Jacobs had performed the training management duties when she was the dispatch supervisor.

24   Prior to when Jacobs' performed these duties, a police assistant handled the training

25   _____

26          [8] Although Plaintiff argues and states in her declaration that she heard Simonnetti say
     to then Chief Cutaia that Plaintiff was running a scam with her doctor's note, Plaintiff
27   testified in her deposition that she heard Simonetti say that she was running a scam by
     working every Friday for overtime.  In response, she went back to her office and collected
28   the schedules for the entire year of dispatching.  (*Compare* Gonzales Decl., ¶ 11 *with* Sidran
     Decl., Ex A (Gonzales Depo.) at 158:3-18.)  Therefore, the Court finds that this portion of
     her declaration is a sham affidavit and is thus stricken.  Kennedy, 952 F.2d at 266-67.

United States District Court

For the Northern District of California

1  management duties as part of his position as a police assistant.  (*Id*., ¶ 7.)  Smith asked then-

2  Dispatch Supervisor Jacobs whether she thought Plaintiff could perform the training

3  management duties in conjunction with her evidence duties.  Jacobs told Smith that she believed

4  Plaintiff could handle the training management duties and would do them well because Plaintiff

5  had a side business as a travel agent.  (*Id*.)

6        Plaintiff admits that the evidence portion of her job consists of 20-30 hours.  (First

7  Amended Compl., ¶ 35.)  Plaintiff testified that since becoming a police assistant, she has been

8  requested to work overtime on only two or three times to be at crime scenes.  (Solomon Decl.,

9  Ex.1 (Gonzales Depo.) at 313:22-314:10.)  Plaintiff further testified that she has never been

10  criticized by her supervisor for not getting enough work done.  (*Id*., Ex. 1 at 324:3-6.)

11  Moreover, as Defendants point out, during her first year as a police assistant, Plaintiff

12  volunteered to work over 275 hours of overtime in the Dispatch Center.  (Simonetti Decl., ¶ 23.)

13  Volunteering to work almost seven full weeks of overtime undercuts Plaintiff's contention that

14  she was overworked and exhausted from her regular job as a police assistant.[9]  Based on the

15  evidence in the record, the Court finds that Plaintiff has not demonstrated the existence of a

16  question of fact as to whether she was forced to perform an unreasonably high amount of work.

17          **d.**    **Placing Plaintiff on Sick Leave Monitoring.**

18        In June 2006, Peterson placed Plaintiff on sick leave monitoring for 90 days because he

19  believed she had used an excessive amount of sick leave.  In the previous 29 months, Plaintiff

20  had used approximately 389.5 hours of sick leave (almost 10 work weeks).  (Declaration of

21  Gary Peterson, ¶ 2, Ex. 1.)  The Police Department's rules provide that a supervisor may

22  monitor employees who use excessive sick leave.  (*Id*., Ex. 1.)

23        Plaintiff contends that Peterson reprimanded Plaintiff in writing for sick leave abuse,

24  even though Plaintiff took the time off due to her industrial injury.  When Plaintiff inquired

25  about family medical leave, she was told that she would have to take such leave unpaid, even

26  though she had accrued over 500 hours in sick leave, vacation and comp time.  (*Id*., ¶ 14.)

27

28       [9] Although Plaintiff argues that her immediate supervisor, John Sylvia, testified that
the maintenance of the evidence property room is "more of a full-time job," Plaintiff did not
file this portion of Mr. Slyvia's deposition transcript.

United States District Court

For the Northern District of California

1  Plaintiff testified that in October of 2005, Peterson admitted in a memo that he knew her

2  reason for sick leave.  She further states that when she met and talked with Peterson about her

3  sick leave, she told him that her sick leave had been due to her injury from her neck, which is

4  her disability.  (Sidran Decl., Ex A (Gonzales Depo.) at 259:6-15.)  But as the memo states,

5  Plaintiff had an obligation to inform the Police Department at the time she called in that she was

6  taking industrial leave versus sick leave.  The memo states that Plaintiff is required to follow

7  the rules and provides that Plaintiff's use of sick leave would be monitored for ninety days.  It is

8  not clear that merely monitoring Plaintiff's use of sick leave constitutes an adverse employment

9  action.  Moreover, the Court finds that Plaintiff has not demonstrated a the existence of a

10  question of fact regarding whether Plaintiff was discriminated against based on her disability by

11  requiring her to follow the rules on stating the nature of her sickness or injury.

12
13  **e.      Smith's Refusal to Answer Substantive Questions by Background Investigator Regarding Plaintiff.**

14  In August 2006, then Commander Smith was contacted by a background investigator for

15  the City of Citrus Heights who said he was conducting a background investigation on Plaintiff.

16  (Smith Decl., ¶ 2.)  Smith states in his declaration that he refused to answer substantive

17  questions about Plaintiff because it is his practice not to answer questions from a prospective

18  employer about an employee unless the employee has asked him to provide a personal

19  reference.  Plaintiff had not asked Smith to provide a reference for her.  (*Id.*, ¶¶ 3, 4.)  However,

20  Smith initially stated that he did not speak to the background investigator from Citrus Heights

21  based on a standard Police Department procedure to say nothing to background investigators

22  but instead, allow the files to speak to themselves.  (Gonzales Decl., Ex. N.)  The Court finds

23  that changing Smith's stated reason for not speaking to the background investigator about

24  Plaintiff creates a question of fact regarding whether Defendants' current position is pretext for

25  discrimination.

26  **f.      Plaintiffs' Allegedly Ignored Complaints**.

27  Plaintiff also contends that she made formal complaints about discrimination and

28  harassment in 2002 and 2005 that were not investigated.  However, Plaintiff testified regarding

the memos in she wrote in June 2002 that they did not mention anything about a disability or that she did not know whether they had anything to do with a disability.  (Sidran Decl., Ex. A (Gonzales Depo at 257:7-258:14.)  She similarly testified that the 2005 memo did not assert that anything was done to her because of a disability.  (Solomon Decl., Ex. 1 (Gonzales Depo.) at 149:14-150:1.)  Therefore, Plaintiff has not submitted any evidence to show that Defendants ignored any complaints she made about discrimination or harassment based on her disability.

      **2.**       **Plaintiff's Retaliation Claim.**

To establish a *prima facie* case for retaliation, Plaintiff must show that she: (1) engaged in protected activity, (2) suffered an adverse employment action, and (3) there was a causal link between the protected activity and the employer's action.  *See Brown v. City of Tucson,* 336 F.3d 1181, 1186 (9th Cir. 2003).

Defendants contend that Plaintiff cannot demonstrate any claim for retaliation based on conduct that occurred prior to July 2006 because that was the first time Plaintiff complained about discrimination based on disability.  Plaintiff counters that she provided multiple complaints and grievances before July 2006, including her memorandum dated October 4, 2005 in which she complains about Peterson's overt criticism of her sick leave usage.  (Opp. at 21-22.)  However, upon review of Plaintiff's memorandum dated October 4, 2005, the Court finds that there is no mention of Plaintiff's disability or even sick leave usage.  (Declaration of David R. Sidran in Support of Plaintiff's administrative motion to file under seal, Ex. A.)  Therefore, Plaintiff has not demonstrated that she engaged in protected activity or that there is a causal link between any protected activity and Defendants' conduct prior to July 2006.

The only alleged conduct that occurred after July 2006 is requiring Plaintiff to perform an unreasonably high amount of work and Smith's refusal to answer questions regarding Plaintiff to a background investigator.  As discussed above, the Court finds Plaintiff has not demonstrated the existence of a question of fact as to whether she was forced to perform an unreasonably high amount of work.  However, with respect to Smith's conduct, causation may be inferred from the proximity in time between Plaintiff's complaint about disability discrimination in July 2006 and Smith's conduct in September 2006, two months later.  *See*

16

1    *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (finding retaliatory conduct less than

2    three months after complaint of discrimination sufficient to establish *prima facie* case of

3    retaliation).  Moreover, as discussed above, although Smith proffers a legitimate non-

4    discriminatory reason for not answering the background investigator's questions, Smith initially

5    provided a different reason for his conduct.  Therefore, Plaintiff has submitted sufficient

6    evidence to create a question of fact as to whether Smith's reason is pretextual.

7            **3.      Plaintiff's Harassment Claim.**

8            Plaintiff brings a harassment claim against all Defendants under FEHA and claim

9    against the City for failure to prevent harassment under FEHA.  Defendants argue that these

10   claims fail because Plaintiff has not asserted any conduct that meets the legal definition of

11   harassment.  Rather, Plaintiff's claims are premised on personnel management decisions which,

12   as a matter of law, cannot support a claim for harassment.

13           California law draws a distinction between discrimination and harassment claims.  *See*

14   *Janken v. GM Hughes Electronics*, 46 Cal. App. 4th 55, 62-63 (1996); *see also Reno v. Baird*,

15   18 Cal. 4th 640, 645-47 (1998) (summarizing *Janken* with approval and affirming *Janken's*

16   delineation between harassment and discrimination).  While individual supervisory employees

17   may be at risk of liability for personal conduct constituting harassment under FEHA, they may

18   not be held individually liable for personnel management decisions later considered to be

19   discriminatory.  *Janken*, 46 Cal. App. at 62-63.  As the court explained in *Janken*, "the

20   Legislature's differential treatment of harassment and discrimination [under FEHA] is based on

21   the fundamental distinction between harassment as a type of conduct not necessary to a

22   supervisor's job performance, and business or personnel management decisions – which might

23   later be considered discriminatory – as inherently necessary to performance of a supervisor's

24   job."  *Id*.  "Harassment is not conduct of a type necessary for management of the employer's

25   business or performance of the supervisory employee's job."  *Id*. at 63.  Rather, "harassment

26   consists of conduct outside of the scope of necessary job performance, conduct presumably

27   engaged in for personal gratification, because of meanness or bigotry, or for other personal

28   motives."  *Id*.  In contrast, "commonly necessary personnel management actions such as hiring

and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or non-assignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment." *Id.* at 64; *see also Valente-Hook v. Eastern Plumas Health Care*, 368 F. Supp. 2d. 1084, 1102-03 (E.D. Cal. 2005) (finding defendant's conduct, such as refusing to release a paycheck unless plaintiff discussed a fitness-for-duty test, fell within the scope of job duties necessary to business and personnel management, and thus, did not constitute harassment under FEHA).

Plaintiff does not dispute that Defendants never called Plaintiff any derogatory names based upon her disability, never told any disability related jokes, and never laughed at her because of her disability. Instead, Plaintiff argues that Defendants' misuse of personnel management decisions constitutes harassment. (Opp. at 29.) However, under California law, personnel management decisions "do not come within the meaning of harassment." *Janken*, 46 Cal. App. at 64. Therefore, the Court grants Defendants' motion for summary judgment on Plaintiff's harassment claims.

**4.      Plaintiff's Emotional Distress Claim.**

The elements of a claim for intentional infliction of emotional distress are: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress." *Cole v. Fair Oaks Fire Dept.*, 43 Cal. 3d 148, 155 n.7 (1987); *see also Lee v. Aiu*, 85 Haw. 19, 34 & n.12 (1997). As the court noted in *Cole*, this tort imposes liability for "conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress." *Id.*

Defendants argue that Plaintiff's claim for intentional infliction of emotional distress fails because Plaintiff has not demonstrated that Defendants engaged in outrageous conduct. In *Janken*, the court found that "[m]anaging personnel is not outrageous conduct beyond the bounds of human decency, but rather conduct essential to the welfare and prosperity of society." 46 Cal. App. 4th 55, 80 (1996). Therefore, the court held that "[a] simple pleading of personnel

United States District Court
For the Northern District of California

1  management activity is insufficient to support a claim of intentional infliction of emotional

2  distress, even if improper motivation is alleged.  If personnel management decisions are

3  improperly motivated, the remedy is a suit against the employer for discrimination."  *Id*.  Courts

4  have followed the holding in *Janken* and dismissed intentional infliction of emotional distress

5  claims premised on personnel management decisions.  *See e.g. Walker v. Boeing Corp*, 218 F.

6  Supp. 2d 1177, 1190 (C.D. Cal. 2002) ("Terminating an employee for improper or

7  discriminatory reasons, like many adverse personnel management decisions, is insufficiently

8  extreme or outrageous to give rise to a claim for intentional infliction of emotional distress.");

9  *see also Helgeson v. Amer. Intern. Group, Inc.*, 44 F. Supp. 2d 1091, 1097 (S.D. Cal. 1999);

10  *Bradshaw v. Glatfelter Ins. Group*, 2009 WL 1438265, *4 (E.D. Cal. May 20, 2009); *Bragg v.*

11  *East Bay Regional Park Dist*., 2003 WL 23119278, *8-9 (N.D. Cal. Dec. 29, 2003).  As

12  discussed above, the Court finds that Defendants' alleged conduct merely constitute personnel

13  management decisions.  Therefore, Plaintiff has not submitted any evidence demonstrating the

14  existence of a question of fact regarding whether Defendants engaged in outrageous conduct

15  necessary for her claim of intentional infliction of emotional distress.[10]

16       **5.**       **Plaintiff's Claim for Failure to Prevent Discrimination.**

17       Defendants argue that although an employer has an obligation under FEHA to take all

18  reasonable steps necessary to prevent discrimination in the workplace, Defendants cannot be

19  liable because Plaintiff has failed to prove any discrimination occurred.  Where the Court has

20  made a specific finding that Plaintiff does not have a claim for discrimination, Defendants

21

22            [10] At least one court has limited the scope of the holding in *Janken* to intentional infliction of emotional distress claims against supervisory employees.  *See Jelincic v. Xerox*

23  *Corp*, 2004 WL 2217643, *6 (N.D. Cal. Oct. 1, 2004) (finding *Janken* inapposite to IIED claim against an employer).  The Court need not resolve this apparent conflict regarding

24  whether employers may be held liable for intentional infliction of emotional distress claims premised on personnel management decisions because this claim against the City fails for

25  another reason.  This claim is barred against the City by California Government Code § 815. *See Miklosy v. Regents of University of California*, 44 Cal. 4th 876, 899 (2008) (California

26  Government Code § 815 "abolishes common law tort liability for public entities.").  Because the Court finds that Plaintiff cannot bring a claim for intentional infliction of emotional

27  distress against the individual Defendants or the City based personnel management decisions, the Court need not determine whether the individual Defendants are entitled to

28  discretionary immunity under California law or whether this claim is preempted by the Workers' compensation statutes.

cannot be liable for a failure to prevent discrimination.  *See Trujillo v. North County Transit Dist.*, 63 Cal. App. 4th 280, 288-89 (1998).  However, the Court found that Plaintiff's claim for discrimination survives summary judgment on the claim that Smith failed to speak with the background investigator.  Therefore, Plaintiff's claim for failure to prevent discrimination similarly survives summary judgment on Plaintiff's narrowed discrimination claim.

**6.      Plaintiff's Claims for Damages.**

Defendants argue that the Plaintiff seeks damages in support of all of her causes of action such as emotional distress and that such damages are barred by the exclusivity provisions of California's Workers' Compensation Act.  Defendants also argue that Plaintiff's attempt to assert a claim for damages based on alleged aggravation to her cervical injury are similarly barred.  As discussed above, Plaintiff's claim for disability discrimination, retaliation and failure to prevent discrimination based on Smith's failure to speak to the background investigator survives Defendants' motion for summary judgment.  Plaintiff is entitled to pursue damages incurred as a result of these narrowed claims.

To the extent Plaintiff sought to amend her complaint through her case management statement to assert a claim for damages based on alleged aggravation to her cervical injury, Plaintiff failed to follow the proper procedures to seek leave to amend.  Therefore, the Court finds that Plaintiff does not have a claim for damages based on alleged aggravation to her cervical injury.  Accordingly, the Court need not determine whether such claim would be barred by the exclusivity provisions of the Workers' Compensation Act.

**7.      Defendants' Affirmative Defense of Waiver.**

Finally, Defendants argue that Plaintiff waived her claims against Smith by signing a release with the City of Citrus Heights.  Defendants submit the City of Citrus Heights' release and waiver signed by Plaintiff which provides: "I hereby release, discharge, and exonerate KP Research Services, their agents, employees and representatives and any person furnishing information from any and all liability or damages, whether in law or equity, for furnishing and inspection of such documents, records and other information. ..."  (Smith Decl., Ex. 1.)  The Court finds that the language of this release is ambiguous regarding the scope of the claims it

United States District Court
For the Northern District of California

20

**United States District Court**
For the Northern District of California

1   covers.  It is not clear that this release covers Plaintiff's claim for discrimination based on a

2   *failure to provide* information, as opposed to a claim for furnishing negative information.

3   Moreover, it is not clear whether the City is an intended third party beneficiary of the release

4   between Plaintiff and the City of Citrus Heights.  Therefore, the Court denies Defendants'

5   motion for summary judgment on this ground.

6                                              **CONCLUSION**

7           For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART

8   Defendants' motion for summary judgment as follows: (1) the Court DENIES Defendants'

9   motion on Plaintiff's claim for disability discrimination, retaliation and failure to prevent

10  discrimination based on Smith's failure to speak to the background investigator; and (2) the

11  Court GRANTS the remainder of Defendants' motion for summary judgment.

12          **IT IS SO ORDERED.**

13

14  Dated: June 30, 2009

15                                              JEFFREY S. WHITE
                                                UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28